UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

MERCH TRAFFIC, LLC                                                      PLAINTIFF

v.                                                          No. 3:21-cv-576-BJB

VARIOUS JOHN DOES, ET AL.                                              DEFENDANTS

* * * * *

OPINION & ORDER

If a civil-procedure professor fell asleep listening to Metallica, what dream—or nightmare—might follow?  Enter Sandman: a suit for an emergency ex parte nationwide injunction authorizing off-duty cops to seize bootlegged Metallica shirts from "Various John Does" throughout the band's summer tour.  Complaint (DN 1) at ¶¶ 1–3, 6–8.  The plaintiff, Merch Traffic, is a licensing outfit that serves as master of trademarks for the thrash-metal band.  Anticipating trademark violations under the Lanham Act, Merch Traffic sued to temporarily restrain the sale—and authorize the seizure—of infringing merchandise.  TRO Motion (DN 5-1).  But whom to restrain?  Based on past experience, Merch Traffic was confident in the counterfeiting, if not the counterfeiters, found outside concert venues.  So it sued unknown Doe defendants, described the fake shirts it expected to find, and hired officers to serve the court papers on any bootleggers-turned-defendants who would—at least in theory—later show up in court.  The trigger for this "dispute" was the opening shows of Metallica's tour at the Louder Than Life festival in Louisville.

Not content with policing only the tour opener, however, Merch Traffic looked to the rest of the venues on Metallica's tour, which stretched from California to Florida.  *See* 2021 Tour Dates (DN 5-7).  In addition to the TRO and seizure order, it also requested a preliminary injunction breathtaking in the vastness of its jurisdiction, enforcability, and disdain for ordinary property and procedural rights:

It is further ordered, that the U.S. Marshal for this district or for any district in which Plaintiff seeks to enforce this Order in the United States, the state police, local police, local deputy sheriffs or off-duty officers of the same, and any person acting under their supervision … are hereby authorized to seize and impound any and all infringing merchandise bearing any or all of the Group's Trademarks … within a five (5) mile vicinity of the stadiums, arenas or other venues at which the Group shall be performing or elsewhere where such merchandise is

1

> being sold, held for sale or is otherwise found, including in any carton,
> bag, vehicle, or container in which the merchandise is transported or
> stored.

Certificate of Counsel, Exhibit C (DN 5-5) at 4 (quoting a preliminary injunction
Merch Traffic had previously obtained). Read literally, such an order would allow
any off-duty sheriff's deputy, wherever he may roam, and any friend or colleague
under his "supervision," to take any shirts or other gear they deem infringing out of
any car, bag, or container within five miles of any concert venue or *anywhere else* the
goods are sold "or otherwise found."

## I.

How is any of this lawful?

Federal litigation over bootlegging copyrighted merchandise at concerts dates
at least to the early 1980s, when Billy Joel secured a TRO and seizure order for
unauthorized merchandise "bearing Joel's name or likeness" outside his concert at
the Milwaukee Arena. *See Joel v. Various John Does*, 499 F. Supp. 791, 792 (E.D.
Wis. 1980). "Joel's success" at the piano, the court explained, "spawned a curious
underground industry which capitalizes upon his popularity," involving "a number of
persons who show up at Billy Joel's concerts with merchandise, usually T-shirts
which bear Joel's picture and name." *Id.* at 792. Although this appeared to clearly
violate the Lanham Act and state law, enjoining unknown defendants still
"trouble[ed]" the judge:

> A court does not have the power to order injunctive relief against a
> person over whom the court has not [ac]quired in personam jurisdiction.
> A court does not have the power to enjoin the behavior of the world at
> large. Furthermore, as a general rule, the federal courts do not favor
> the naming of "John Doe" defendants.

*Id.* (citations omitted). Yet the judge overcame these concerns based on Billy Joel's
irreparable injury, service of the summons and order on the offenders whose
merchandise was seized, and the expectation that these persons would "reveal their
names so that they can be added as parties to the lawsuit" and "appear in court" two
days later to "contest the seizures." *Id.* "While the proposed remedy is novel," the
judge acknowledged, a "court of equity is free to fashion *whatever* remedies will
adequately protect the rights of the parties before it." *Id.* (emphasis added). Perhaps.
But even assuming wide-ranging remedial powers, that wouldn't answer the
jurisdictional questions that previously troubled the court.

Such seizure orders became less novel four years later, thanks to Congress'
special solicitude for music merchandise, brand-name foodstuffs, designer goods,
medical devices, and other trademarked items. *See* Jed S. Rakoff & Ira B. Wolff,

*Commercial Counterfeiting and the Proposed Trademark Counterfeiting Act*, 20 AM. CRIM. L. REV. 145, 151–53, 178 (1982) (describing predecessor version of trademark-counterfeiting legislation Congress enacted two years later).   The Trademark Counterfeiting Act of 1984 added criminal penalties for counterfeiting, 18 U.S.C. § 2320, treble damages or disgorgement for intentional trafficking, 15 U.S.C. § 1117, and—most relevant here—ex parte seizures, 15 U.S.C. § 1116.   *See* Pub. L. No. 98-473, 98 Stat. 1837, 2178 (1984).   Previously no express ex parte seizure authority existed, *see* S. Rep. No. 98-526, at 1–3 (1982), although some courts—as in the *Joel* case—authorized it as part of TROs issued under Rule 65(b).   *See* 499 F. Supp. at 792; Rakoff & Wolff at 166.

Section 1116(d) authorizes seizure at the initiation of trademark holders, and does so in terms that seek to ensure preservation of evidence that might otherwise evaporate before a trademark violation could establish a trademark violation.   *See* Steven N. Baker & Matthew Lee Fesak, *Who Cares About the Counterfeiters? How the Fight Against Counterfeiting Has Become an In Rem Process*, 83 ST. JOHN'S L. REV. 735, 755–56 (2009) (arguing Congress principally intended seizures to facilitate enforcement, not confiscation).   It addresses the situation in which notice could prove self-defeating because "the person against whom seizure would be ordered" likely "would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person."   § 1116(d)(4)(B)(vii).   In that circumstance, a court may grant an "ex parte" order "providing for the seizure of goods and counterfeit marks involved in [a trademark] violation and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation."   § 1116(d)(1)(A).   This connotes litigation beyond merely taking the infringing goods.   Why authorize seizure of "records… involved in such violation" except to prosecute (rather than simply pilfer) suspected bootleggers? Baker & Fesak at 756.

Congress imposed a number of protections for defendants and third parties that acknowledge the incongruence of this seizure authority with basic norms of property rights and due process.   To start, applicants must notify the U.S. Attorney in case "such proceedings may affect evidence of an offense against the United States," § 1116(d)(2)—that is, in case private seizure would interfere with public law-enforcement activity.   A "Federal," "State[,] or local law enforcement officer," moreover, must carry out the property seizure.   § 1116(d)(9).   To compensate for any potential harms from a wrongful seizure, applicants must post a bond. § 1116(d)(5)(D).   Contrary to ordinary notions of notice, the order must be sealed, § 1116(d)(8), and the applicant must *not* publicize the requested seizure, § 1116(d)(4)(B)(ii).   And apparently in response to concerns that applicants could abuse these orders to obtain competitors' trademark secrets, the court (rather than the applicant) takes custody of seized items and "enter[s] an appropriate protective

3

order with respect to discovery" of anything seized "and use of any records or information." § 1116(d)(7).[1]  *See* Rakoff & Wolff at 222–23.  A hearing must occur between 10 and 15 days after the order is issued, allowing defendants to appear and contest the seizure.  § 1116(d)(10)(A).  Finally, after a violation under § 1125 "shall have been established," 15 U.S.C. § 1118 authorizes the destruction of the seized counterfeit property.

## II.

Merch Traffic's seizure motion satisfied the relevant requirements of the Trademark Counterfeiting Act.  It notified the acting U.S. Attorney for the Western District of Kentucky, § 1116(d)(2), didn't publicize the seizure order, § 1116(d)(4)(B), provided a $5,000 bond, § 1116(d)(4)(A), and made the showing called for under § 1116(d)(4)(B): another order would be inadequate to avoid immediate and irreparable injury at the concert, where persons would likely be selling counterfeit goods, which they would destroy or hide if notice were provided.  TRO Order (DN 12) at 1–2.

Its motion also made the required showing for a TRO under Rule 65: a likelihood of success on the merits of a trademark infringement action, irreparable injury, no substantial harm to others, and the public interest in favor of a TRO.  *Id.* at 3.  So the Court issued a combined TRO and seizure order.  DN 12.  In effect, the statutory seizure order allowed Merch Traffic to take the goods, while the restraining order prohibited the Doe defendants from further sales.

Based on jurisdictional and equitable concerns similar to those expressed by the *Billy Joel* judge 40 years ago, however, the Court declined to rule immediately at the TRO hearing on the preliminary-injunction request.  This request from Merch Traffic (and apparently many other trademark owners in past cases) went further than the already expansive rights secured by the Trademark Counterfeiting Act.  According to counsel, a temporally and geographically open-ended injunction was necessary because a mere "temporary restraining order and order of seizure at a

---

[1] The statute reveals an unusual concern for defendants' privacy at the expense of ordinary notice and transparency.  *See* § 1116(d)(6) (court must "take appropriate action to protect the person against whom an order under this subsection is directed from publicity…").  Even stranger things follow.  *See* § 1116(d)(9) ("court shall issue orders, when appropriate, to protect the defendant from undue damage from the disclosure of trade secrets or other confidential information during the course of the seizure, including, when appropriate, orders restricting the access of the applicant … to such secrets or information.").  Why does the law task the plaintiff and the court with taking affirmative action to protect the interests of defendants?  Presumably because—in the nature of an ex parte John Doe proceeding—those persons are absent, unknown, and therefore unable to protect their interests in an "adversary" proceeding.

single concert site would not prevent these itinerant peddlers from following the performers' tour and continuing to prey upon and infringe their property rights." Counsel Declaration (DN 5-2) ¶ 15.

What results did the TRO and seizure order achieve at the Louisville show? As required by Rule 65(b)(3) and 15 U.S.C. § 1116(d)(10)(A), the Court held a hearing 11 days after Louder Than Life.  DN 17.  Merch Traffic said it seized 250 pieces of bootleg merchandise at the concert, and showed representative samples in court. Although Merch Traffic represented that it had served potential defendants with this Court's orders—as it was required to do by § 1116(d)(9)—none appeared at the hearing, and Merch Traffic did not identify any sellers from the concert.  Perhaps unsurprisingly, none of the people whose merchandise was seized as counterfeit volunteered their names to the off-duty officers so they could be added as defendants in federal court.  Counterfeiting trademarked items is, after all, a federal felony.  18 U.S.C. § 2320.  So the Doe defendants in this case remain unidentified, unprosecuted, and unforgiven.

Merch Traffic also backed off its request for a forward-looking nationwide injunction: contrary to its earlier expectation, the tee shirts it seized displayed Metallica marks alongside "Louder Than Life" and "Louisville," not future concert dates.  And seeing those tour dates, at least in counsel's mind, would've linked the peddlers here with bootleggers elsewhere on the tour.  *See* Burns Declaration (DN 5-2) at ¶ 22; Donnell Declaration (DN 15) at 2.  The arguments originally offered in support of a nationwide injunction, therefore, were undermined by the evidence seized under the TRO.  So Merch Traffic indicated that later it would, with the Court's permission, seek and later destroy the infringing merchandise and ask for its bond back.  To date, however, no defendants have appeared in this case, Merch Traffic has not asked for its money back, and the counterfeit Metallica shirts presumably remain in the "substitute custody" of plaintiff's counsel.

### III.

"[T]his seizure and forfeiture procedure," according to some commentators, "has been utilized well beyond the wildest expectations of the enacting Congress." Baker & Fesak at 741.  And even though the Trademark Counterfeiting Act may have spawned "literally thousands of actions in which ex parte seizures have been authorized and have been executed without a hitch, … there are relatively few reported cases which even discuss ex parte seizures."  *Id.* at 742 (quoting Jules D. Zalon, *Ex Parte Seizure Orders: Don't Kill the Goose That Laid This Golden Egg!*, 23 Colum.-VLA J.L. & Arts 181, 191 (1999)).

That is a shame, because relief of the sort Merch Traffic requested combines at least five features unusual to federal litigation: (1) "emergency" proceedings, (2) ex parte orders, (3) seizure without a contested pre- (or really even a post-) deprivation

hearing, (4) "John Doe" defendants, and (5) nationwide injunctions. Some of these moves are indeed contemplated by the Lanham Act and Rules of Civil Procedure. But what is merely counterintuitive in isolation may become unlawful in combination.

*First*, why the rush for emergency relief? Merch Traffic came to court 8 days before a concert date scheduled far in advance. *See, e.g.*, Scott Recker, *Nine Inch Nails, Metallica, Korn Headline Louder Than Life 2021*, LEO WEEKLY, May 14, 2021, https://www.leoweekly.com/2021/05/nine-inch-nails-metallica-korn-headline-louder-life-2021/. Bootlegging has plagued music venues for decades. *See, e.g.*, *Joel*, 499 F. Supp. at 792. And none of the evidence relied on in Merch Traffic's filings was time-sensitive; it all drew on long experience marketing merchandise in the face of counterfeit competition. *See* TRO Motion at 2–3 (describing 8 previous orders obtained by Merch Traffic regarding Metallica's trademarks).[2] Yet Merch Traffic didn't file after the concert was scheduled, when the Court might've had more time to consider its baroque procedural arguments or entertain opposing views. It waited until the eve of the tour. Under similar circumstances just before a late-90s Led Zeppelin Tour, one district court decried counsel's "artificial air of emergency" and denied a TRO and seizure order. *Plant v. Doe*, 19 F. Supp. 2d 1316, 1317 (S.D. Fla. 1998).

At least some of the time-crunch, however, is explained by the deadlines imposed by Rule 65 and § 1116. A temporary restraining order typically expires 14 (and never more than 28) days after entry absent the "adverse party['s] consent." FED. R. CIV. P. 65(b)(2). Under the Trademark Counterfeiting Act, a seizure order expires even sooner—"not later than seven days after the date on which such order is issued." § 1116(d)(5)(C). The injury that a seizure could prevent must be "immediate." § 1116(d)(4)(B)(iv). And the applicant must return to court for a hearing after the seizure but between 10 and 15 days after the order's issuance. § 1116(d)(10)(A).

The narrow window for such orders incentivizes plaintiffs to wait until an injury becomes imminent before seeking relief, even though trademark holders are surely aware of bootlegging risks even before tour dates are set, and even though neither Rule 65 nor the Lanham Act require that plaintiffs wait until the last minute to make a showing of immediate and irreparable future injury. But the timing of Merch Traffic's request placed Metallica's Louisville concert squarely within the lifespan of a seizure order and TRO. So despite the strain short-fuse emergency orders place on the courts—effectively jumping ahead of hundreds of other pending

---

[2] Metallica itself, as longtime listeners may recall, is no stranger to IP litigation, having led the charge against Napster in the early 2000s. *See Metallica v. Napster, Inc.*, No. 00-4068, 2001 WL 777005, at *1–2 (N.D. Cal. Mar. 5, 2001) (preliminary injunction against Napster regarding the distribution of Metallica's copyrighted music).

cases awaiting judicial attention, *see J.P. Morgan Secs. LLC v. Kittell*, 554 F. Supp. 3d 895, 898 (W.D. Ky. 2021)—this cadence is authorized and even encouraged by the Civil Rules and the Lanham Act.  On this point, like others below, what is inefficient is not always illegal.

*Second*, the ex parte nature of the seizure order issued here is unusual, albeit expressly authorized: "the court may, upon ex parte application, grant an order … providing for the seizure of goods and counterfeit marks…."  § 1116(d)(1)(A).  This sits in some tension with "our … jurisprudence," which according to the Supreme Court, "runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute."  *Granny Goose Foods v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 439 (1974).  "[T]hose against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits," given that "serious penalties can befall those who are found to be in contempt of court injunctions."  *Id.* at 444.  Nonetheless, the Supreme Court in *Granny Goose*, like the *Billy Joel* court six years later, managed to overcome these concerns to conclude that "[e]x parte temporary restraining orders are no doubt necessary in certain circumstances."  *Id.* at 439.  There, as here, the plaintiff satisfied the requirements for ex parte temporary injunctive relief under Rule 65.  *See* TRO Order at 3–4.  Merch Traffic satisfied the Trademark Counterfeiting Act's requirements for an ex parte order, too.  *See id.* at 2–3 (applying § 1116(d)).  And in its view, nothing else matters.  Indeed, it is hard to argue, at least on statutory grounds, that Congress blessed ex parte seizures of the sort innovated in *Billy Joel* and deployed here.

*Third* in this list of oddities, however, is the hollow sound of the hearings meant to satisfy due process concerns.  Unlike most ex parte orders, this sort does not merely preserve the status quo until an adversarial hearing may be held—though that was part of their original justification.  *See In re Vuitton et Fils SA*, 606 F.2d 1, 4 (2d Cir. 1979) ("The ex parte temporary restraining order is indispensable to the commencement of an action when it is the sole method of preserving a state of affairs in which the court can provide effective final relief.").  Instead, these orders *alter* the status quo by allowing plaintiffs to seize the (suspected) counterfeit goods before any hearing.  § 1116(d)(1)(A).

Ordinarily due process requires a hearing before defendants must surrender property.  *See, e.g., Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).  But sometimes pre-deprivation notice and hearing present a "danger of destruction or alienation [that] cannot be guarded against" by "warning" defendants who are "acting in bad faith."  *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 609 (1974).  Congress expressly invoked these concerns in the Trademark Counterfeiting Act.  *See* § 1116(d)(4)(B)(vii) (defendants could "destroy, move, hide, or otherwise make such matter inaccessible

to the court"). Under these exceptional circumstances, the Supreme Court has held that the government may constitutionally deprive persons of property interests without a hearing beforehand—so long as the need is appropriate, procedural safeguards are in place, and a *post*-deprivation hearing is reasonably available. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976) (describing an "ultimate balance involv[ing]" the owner's and government's interests, the costs and burdens of additional procedures, the likelihood of error, and "a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness.").

In the bootlegging context, the statute's application may honor *Mitchell* and *Mathews* in word more than deed. Under § 1116(d)(4), applicants must offer evidence indicating the likelihood of irreparable harm and infringement, the place where the goods will be found, and whether the goods will likely be moved or hidden if the seizure order isn't issued ex parte. If the judge agrees, officers must serve the summons, complaint, and court order on the individuals they find with the counterfeit goods and then, "upon making service," carry out the seizure order. § 1116(d)(9). This requires at least some form of notice and the option of a hearing. But what if, in practice, no contested post-deprivation hearing ever occurs? Plaintiff's counsel candidly admitted that one-sided post-deprivation hearings are standard in this context: "no defendant bootlegger has ever appeared." TRO Motion at 4. Does an uncontested pro forma hearing match the Supreme Court's understanding of due process to require a meaningful post-deprivation hearing? *See generally* Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1274 (1975) (describing "trend toward greater and greater insistence on hearings").

As a further protection, Congress required seizures through "neutral and impartial" law-enforcement officers rather than self-help. *Warner Bros. v. Dae Rim Trading*, 877 F.2d 1120, 1125 (2d Cir. 1989). The prudence of this step is obvious, given all that could go wrong during arena-rock round-ups. *See, e.g., Plant*, 19 F. Supp. 2d at 1321–22 (questioning the public interest in "forcibly confiscat[ing] the merchandise of unsuspecting vendors at a rock concert where people are probably already in a rowdy mood"). Merch Traffic used law-enforcement officers, but they were off duty and out of uniform. TRO Order at 4 n.1. And its proposed order (which the court rejected) would've authorized seizure by *anyone* so long as he or she was *supervised* by officers. Certificate of Counsel at 4. This may not be a good corner to cut, as other courts have noted: "[T]he use of plainclothes personnel to serve and enforce court orders of this type may be more conducive to violence than to discouraging bootlegging." *Brockum Co. v. Various John Does*, 685 F. Supp. 476, 478 (E.D. Pa. 1988).

So although Merch Traffic appears to have complied, at least in some sense, with all the statute's requirements for (admittedly watered down) pre- and post-

deprivation hearings, questions linger about how "tailored," "meaningful," and "effective" that process proved under the circumstances. *Mathews*, 424 U.S. at 349. No defendants challenged Merch Traffic's version of the story, none gave the officers their names, none appeared at the post-deprivation hearing, and none had counsel make an appearance.[3] So this entire litigation, and the property seizures it spurred, has been entirely uncontested. According to plaintiff's counsel, this is the norm: no defendants *ever* show up to contest § 1116(d) seizures. *See* TRO Motion at 4. Presumably that is why the merchandise still remains in the court's custody. It doesn't belong to Merch Traffic, its previous owners haven't claimed it, and its infringement hasn't been established—the precursor to destruction of seized articles under the statute. 15 U.S.C. § 1118.

As described by the Second Circuit, "this case is not only 'extraordinary,' it approaches the bizarre." *See Vuitton*, 606 F.2d at 3 n.5. At least these first three aspects of the request—an emergency ex parte order with limited post-deprivation process—can be traced to the statute. But the fourth and fifth questions raised—unknown defendants and nationwide injunctions—are tougher for Merch Traffic to answer.

*Fourth*, the use of Doe defendants deprives courts of the usual adversarial process. The Trademark Counterfeit Act authorizes lawsuits against un-*noticed*, not un*known*, parties. § 1116(d)(1)(A). FED. R. CIV. P. 10(a) generally requires plaintiffs to name the parties in a complaint. *See generally Doe v. Porter*, 370 F.3d 558, 560–61 (6th Cir. 2004) (recognizing limited exceptions to Rule 10(a)); *Signature Mgmt. Team, LLC v. Doe*, 876 F.3d 831, 836–39 (6th Cir. 2017) (discussing factors militating against unidentified parties). As recognized back in the *Billy Joel* order, the use of John Doe defendants is disfavored, if not necessarily disallowed. 499 F. Supp. at 792 (citing, *e.g.*, *Fifty Associates v. Prudential Insurance Company,* 446 F.2d 1187 (9th Cir. 1970)); *see also World Wrestling Entertainment, Inc. v. Unidentified Parties*, 770 F.3d 1143, 1145 (5th Cir. 2014) ("Doe" identifier doesn't preclude ex parte seizure order under § 1116(d) where plaintiff can "readily identif[y]" counterfeiters by other means).

---

[3] Merch Traffic's Vice President described the execution of the seizure order in a declaration filed after the Louisville concert: "Almost all of the Defendants refused to identify themselves to the Louisville Metropolitan Police Department Officers who served the TRO and Seizure Order and the other documents or claimed not to carry any identification. In addition, most of the Defendants refused to accept a copy of the TRO and Seizure Order, receipt and other documents. Often the Bootleggers, when approached by the officer or process server, would ask if the officer/server had an injunction or order. Then, when the officer/server responded in the affirmative and tried to serve the TRO and Seizure Order, the Bootleggers would hand over or drop the Infringing Merchandise (and the TRO and Seizure Order just served on them) and then walk or run away." Donnell Declaration ¶ 5.

It's hardly clear, however, that the practices currently used by applicants such as Merch Traffic comport with the statutory requirements of § 1116(d). Plaintiffs nowadays often seek these orders to address "fly-by-night counterfeits," not the problem of "destruction of evidence" addressed more directly by the statute's plain terms. *See* Daniel Grobman, Note, *Preemptive Ex Parte Seizure Orders and Substantive Relief: A Far Cry From Congressional Intent*, 33 CARDOZO L. REV. 1185, 1202 (2012). What Congress apparently designed as a procedural means may now be deployed far more often as a substantive end: seizing offending property rather than punishing offending persons. *Id.*; *compare* TRO Motion at 13–15 (collecting cases); Burns Decl. ¶¶ 1, 6 (listing four pages of string-cited seizure orders secured by plaintiff's counsel on behalf of music-trademark clients); *with* Baker & Fesak at 755–56 (Congress intended seizures to facilitate in personam enforcement, not in rem confiscation); § 1116(d)(4)(B)(vii) (seizure contingent on finding that person who would otherwise "destroy, move, hide, or otherwise make such matter inaccessible to the court"). By its own terms, § 1116 insists that defendants eventually receive notice and an opportunity to be heard through the mandatory post-seizure hearing—which can only be waived with the consent of "all the parties." § 1116(d)(10)(A). But where the opposing party is an unidentified Doe, courts have no choice but to proceed without the benefit of an adversary or any assurance that one will ever appear. And if there's little chance anyone raises an argument of wrongful seizure, then the bond, discovery, hearing, and other statutory measures may prove a nullity. Should we presume Congress included these provisions as mere window dressing?

*Fifth*, and more clearly out of bounds, was Merch Traffic's request for a nationwide preliminary injunction against the sale of infringing goods. TRO Motion at 4–8 (requesting a show-cause order why a preliminary injunction shouldn't issue). Who would respond to such a show-cause order? And how would those not at the Louisville concert fall within this Court's jurisdiction? The Lanham Act provides for nationwide *service*, not jurisdiction. 15 U.S.C. § 1116(a). And it reiterates Rule 65's requirement that an injunction can be granted only "upon hearing, after notice to the defendant." *Id.*; *see* Rule 65(a)(1) (injunction may issue "only on notice to the adverse party").

According to Merch Traffic, however, another portion of Rule 65 filled the gap: a preliminary injunction could sweep in others not found in this District if they are "aiding and abetting, or acting in concert with served Defendants." TRO Motion at 13 (citing FED. R. CIV. P. 65(d)(2)(C)). Merch Traffic theorized that bootleggers in Louisville would be served by the off-duty cops, and on that basis bootleggers at other tour stops would receive notice (of the constructive variety, presumably?) because they must be acting in concert. *See Friedman v. New York City Dep't of Hous. & Dev. Admin.,* 688 F. Supp. 896, 901 (S.D.N.Y. 1988) ("that unknown parties have constructive notice is no dispensable formality … it is an essential element of due

process, without which a court has no jurisdiction to bind the absent parties."). Yet "*[a]ny* person found selling a shirt bearing the entire Tour schedule," according to Merch Traffic, "can fairly be said to be 'aiding and abetting, or acting in active concert with,' served Defendants." TRO Motion at 12–13 (quoting FED. R. CIV. P. 65(d)(2)(C)) (emphasis added). But can they really? That's quite a conspiracy. According to counsel, these "peddlers" are "not neophytes, but rather somewhat sophisticated businessmen who operate in stealth." *Id.* at 8, 12–13. We know they are working in concert, too, apparently because their shirts are similar, some bootleggers tour with the band, and some shirts include the names of all the stops on a given tour. *Id.* at 12–13; Burns Decl. ¶¶ 10, 13, 22. This is a rather weak inference—and one resting almost entirely on conjecture about the past and future rather than evidentiary support regarding the present. And in any event, isn't it equally plausible that dissociated bootleggers are not conspiring to violate trademark laws, but simply working in parallel, each trying to make a few (ill-gotten) bucks by copying the same Metallica merchandise?

Given these concerns about notice and jurisdiction, the Court declined to issue a preliminary nationwide injunction against unknown defendants. While many courts appear to have issued such orders, some dissenting voices have resisted § 1116(d) creep. *See, e.g.*, *Plant*, 19 F. Supp. 2d at 1319–20 (denying ex parte relief because of personal-jurisdiction and due-process concerns); *Araca Merch., LP v. Does*, 182 F.Supp.3d 1290, 1293–95 (S.D. Fla. 2016) (lack of adversarial party, request for extra-judicial relief, and lack of ripeness render case non-judiciable); *Live Nation Merch., Inc. v. Does*, No. 18-cv-2703, 2018 WL 6326321, at *4 (S.D. Cal. Dec. 4, 2018) (bootlegging injuries too speculative to confer standing). Bootleggers actually served at the Louisville concerts may have notice and certainly fall within this Court's geographic jurisdiction. *See, e.g.*, *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952). But bootleggers elsewhere would not—at least not on this limited showing. In addition to the friction this remedy would create with the text of § 1116 and Rule 65 specifically, the relief requested would likewise raise many of the general concerns regarding nationwide injunctions issued by a single district judge. These "have not been good for the rule of law," Chief Judge Sutton recently observed, and "have become a springing easement on the customary deliberative process." *Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, J., concurring) (citing, *e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (2018) (Thomas J., concurring)); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 457–82 (2017) (nationwide injunctions can lead to forum shopping, worse decisionmaking, conflicting injunctions, and doctrinal tension).

The additional complication of unknown defendants presents still more problems at the preliminary-injunction phase. Rule 65(a)(1) requires notice to the adversary for a preliminary injunction to issue, while the Trademark Counterfeiting

Act requires secrecy—forbidding publicization of "the requested seizure," § 1116(d)(4)(B)(ii) (requiring that "the applicant has *not* publicized the requested seizure") (emphasis added).  How could plaintiffs ever comply with both?  Rule 65(a) cannot lawfully extend the reach of a § 1116(d) seizure order through constructive notice that undermines a fundamental aspect of that statute's rationale and text.

Using a preliminary injunction to stretch § 1116(d) seizure raises a timing conflict as well.  The seizure order would lapse in seven days, § 1116(d)(5)(C), but a Rule 65 order would not—at least assuming notice and an opportunity for the adverse party to be heard.  Here, of course, notice and a hearing were utterly lacking.  Again, how could a court extend the reach of § 1116(d) positive authorization without respecting its negative limitations?  *See* Steven N. Baker, *The Never-Ending Seizure Order: How Courts Have Granted Immortality to Congress's Mayfly*, 26 CARDOZO ARTS & ENT. L.J. 369, 379–82 (2008).  The Supreme Court in *Granny Goose* understood that ex parte proceedings are necessarily time-limited: they may preserve the status quo and prevent irreparable harm, but "just so long as is necessary to hold a hearing, and no longer." 415 U.S. at 439.  Here the necessity most apparent under the statute is evidentiary, not proprietary: nothing indicates Congress or trademark holders care a whit about who owns the seized counterfeit shirts, as opposed to who can profit from those marks going forward.  *See* Baker & Fesak at 756 ("[T]he ex parte nature of a seizure order and the strict seven-day statutory limitation on its duration make sense only if it is construed as a tool to preserve the evidence necessary to bring trademark counterfeiters to justice.") (internal quotation marks omitted).  So a preliminary injunction cannot elongate a seizure order—at least not the Frankensteinian variety stitched together here for use against John Doe counterfeiters.

## IV.

Is this seizure litigation really just some kind of monster?  For lawyers of a certain age, the idea of plainclothes men running from concert to concert grabbing tee shirts may call to mind a different sort of extralegal seizure.  In the 2003 film *Old School*, struggling 30-somethings played by Will Ferrell, Vince Vaughn, and Luke Wilson grapple with midlife marital difficulties.  To cope, they start a fraternity of sorts—by racing a dark van around campus to forcibly conscript 14 unconsenting pledges—all while Metallica's 1986 epic *Master of Puppets* blares in the background.[4]

Perhaps the guitar-driven antics of Ferrell, Vaughn, and Wilson inspired Metallica's agents and lawyers to seize property here without notice or process.  More likely, the explanation is far more pedestrian: Merch Traffic designed its litigation strategy with an understandable concern for efficiency.  Wouldn't one nationwide

---

[4] Available, at least for now, at https://www.youtube.com/watch?v=IoevyxD6m5E, and at the movie's 34-minute mark.

preliminary injunction be easier and less costly—for plaintiffs and courts alike—than following a band across the country to ask different judges for different seizure orders at different concerts?  Undoubtedly so.  And counterfeiting remains a real problem, as Congress plainly recognized.  But while efficient enforcement resonates in some of our due process precedent, *see Mathews*, 424 U.S. at 348–49, the law still principally serves to arrest, not accelerate, those who would like to take property held by others, *see Fuentes*, 407 U.S. at 81.  However inconvenient, the rule of law remains as crucial today as it was for an older generation living in the borderlands of the law's reach: "It's infinitely more deadly when the law is disregarded by men pretending to act for justice than when it's simply inefficient." WALTER VAN TILBURG CLARK, THE OX-BOW INCIDENT at 53 (Arrow Books 1973) (1940).

Mindful of this obligation to prioritize law over efficiency—even under a statute as extraordinary as the Trademark Counterfeiting Act—after the preliminary-injunction hearing the Court dissolved the temporary restraining and seizure order, rejected the preliminary injunction that Merch Traffic had by then abandoned, and indicated this opinion would follow.  DN 17; FED. R. CIV. P. 65(b)(3); § 1116(d)(10)(A).  Merch Traffic said it planned to voluntarily dismiss the case, seek permission to destroy the seized merchandize, and ask for return of its bond around 30 days after service on the defendants.  But that day never came.  Merch Traffic instead left the case (and the seized evidence) to languish.  So the Court orders Merch Traffic to file a status report, within 30 days, regarding the seized merchandise and any defendants it has identified and served in the course of this litigation.

Benjamin Beaton, District Judge

United States District Court

August 8, 2022